**HOOPER CONSTRUCTION COMPANY**
v.
**UNITED STATES.**
No. 416–55.

United States Court of Claims.
June 3, 1959.

Robert P. Smith, Washington, D. C., Robert V. Smith, Joseph W. Kiernan, Dorothea A. Baker and Smith, Ristig & Smith, Washington, D. C., on the briefs, for plaintiff.

Lawrence S. Smith, Washington, D. C., with whom was George Cochran Doub, Asst. Atty. Gen., for defendant.

BRYAN, District Judge, sitting by designation.

A contract for the construction for the United States of a levee in the Florida Everglades is the source of these three claims. The first involves the method of measurement of the levee embankment for computing the plaintiff's compensation on the agreed price per cubic yard; the second, the recapture of liquidated damages charged for delay in the completion of the embankment; and the last, the right to rental for equipment while idle but held ready for the compaction of the levee earth. Adopting with a slight change the fact findings of the commissioner, we deny the claims.

On the first and third claims recourse was had to the administrative process furnished by the contract for resolution of disputes. The determinations were adverse to the plaintiff—either for want of merit or for tardiness of prosecution. In effect, denial there of the first claim, as will later appear, denied the second. None of the decisions is vulnerable as arbitrary, capricious, slighting procedural requisites or lacking in evidential support. Nor, as the further discussion will also establish, was any rejection legally offensive.

I. The point of the initial claim is that in ascertaining the cubical content of the embankment (the multiplicand to which the yardage unit price is applied) the Government did not include that part of the embankment comprised between the base of the levee—the ground exposed by the stripping of the land to receive the embankment—and the surface of the ground before the stripping. The contention of the United States is that according to the contract the measure for payment is the volume of the structure above "the natural ground surface", that is, above the level of the ground as it existed before it was disturbed at all except for a survey.

The critical stipulation of the contract reads:

"1–07 Measurement and Payment. — a. Embankment. — This item shall be measured by the cubic yard in place in the levee. The volume between the natural ground surface, as shown by the last survey made before construction commences, and the prescribed construction cross section indicated on the plans, will be paid for at the contract unit price for 'Embankment.'"

Altogether untenable, we think, is the plaintiff's conception of the "natural ground surface" as the ground laid bare by the stripping. The true intendment of the phrase is exampled in the preceding specification by this sentence: "The natural ground surface on the pool side of the levee shall not be disturbed". 1–06. The meaning of the words is illustrated in the contract plans by a cross section of the embankment. There the plane of the ground before stripping is designated as "existing ground surface". The variation in the adjective gives emphasis to what is meant by "ground surface". This cross section is expressly referred to in 1–07, supra, evidently to accent the delineation of the surface.

"Natural ground" is also redefined by the succeeding clause of the specification, as the surface "shown by the last survey made before construction commences". Whether "construction" refers to erection of the embankment only or to the project whole, we believe it undoubtedly includes the clearance and stripping of the ground. Hence, the natural ground surface denotes the plane of the soil as it reposed when the present undertaking began, save as a survey may have disordered it.

True, this manner of measuring a levee embankment was a departure from the customary specification: prior practice accorded with the plaintiff's now asserted interpretation. But the change was distinctly and precisely indicated, and we must read the contract after the words of that document. Note, too, that the connotation urged for them by the plaintiff now would earlier have lost him the contract, for he would not have been the low bidder.

■ II. A corollary to the first, the second claim is to retrieve liquidated damages retained by the Government for delay in completing the embankment. The time for performance of this work was fixed in the contract by prescribing the cubic yardage of the embankment to be constructed on an average each month, and then using this monthly amount as a divisor into "the total quantity of material actually placed and to be paid for under the contract"; the result is the number of months and fraction of a month allowable for the work. Thus the completion period was a quotient depending upon the size of the dividend which was "the total quantity of material * * * to be paid for".

Accepting, as we have, the smaller quantitative dividend, produced by excluding from the "pay dirt" the volume between the natural surface and the surface as stripped, the term for performance of the work is correspondingly shortened. The days in excess of the short term were the basis for the Government's assessment of the liquidated damages. Hence, no remission is justified.

III. For tamping the earthen work of the levee, the contract called for "Initial compaction" and, in the discretion of the Government, "Additional compaction". Anticipating the possibility of this further compaction, the contractor was obligated to have certain tractor and roller equipment available for the work.

The Government did direct the plaintiff to put the machines on the job and the plaintiff obeyed. Afterwards the plaintiff was notified to suspend any additional compaction operations but to keep the equipment on location.

Concededly, the suspension was within the right and privilege of the United States. The initial compaction was paid for. Now the contractor insists that it should also be compensated for the loss of the use of the equipment while in the standby status. The ready response is that definite provision is made in the contract to secure the plaintiff against loss in this very contingency.

■ A "lump sum price or prices" was paid the plaintiff solely for mobilizing and demobilizing the tractors and rollers, and the contractor agreed to an if-and-when-used basis for payment for the operation of the pieces. In this way the contractor was paid for the readiness of the equipment, even though it might never be called into service. That the actual utilization of the units was optional is clear in the contract: "The Contractor will therefore be required to have at his disposal equipment * * * which will be operated if, and to the extent, directed by the Contracting Officer", and "payment for operation of the roller unit, or units, will be made at the appropriate contract unit price, or prices, for 'Additional Compaction'". Again, conclusively, the "time during which operation of the unit is not required, will not be paid for". All of which demonstrates that the plaintiff cannot maintain a claim for a tractor-roller's lay-days.

Judgment must go for the defendant denying and dismissing the plaintiff's petition.

It is so ordered.

JONES, Chief Judge, and LARAMORE, MADDEN, and WHITAKER, Judges, concur.